**BRADLEY/GROMBACHER, LLP**
Marcus J. Bradley, Esq. (174156)
Kiley L. Grombacher, Esq. (245960)
31365 Oak Crest Drive, Suite 240
Westlake Village, California 91361
Telephone: (805) 270-7100
Facsimile: (805) 270-7589
E-Mail: mbradley@bradleygrombacher.com
kgrombacher@bradleygrombacher.com
*Attorneys for Plaintiff and the Putative Class*

**AYLSTOCK, WITKIN, KREIS & OVERHOLTZ, PLLC**
SIN-TING MARY LIU (282884)
17 E. Main St., Suite 200
Pensacola, Florida 32502
Telephone: 850-202-1010
Facsimile: 850-916-7449
E-Mail: mliu@awkolaw.com

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA – SOUTHERN DIVISION

| | |
|---|---|
| CRYSTAL ZURBA, Individually and on Behalf of All Others Similarly Situated,<br><br>    Plaintiff,<br><br>  v.<br><br>CHURCH & DWIGHT CO., INC.;<br><br>    Defendant. | Case No.:<br>**CLASS ACTION COMPLAINT FOR:**<br>1.  VIOLATIONS OF THE UNFAIR COMPETITION LAW;<br>2.  VIOLATIONS OF THE FALSE ADVERTISING LAW;<br>3.  NEGLIGENT MISREPRESENTATION/OMISSION;<br>4.  STRICT PRODUCT LIABILITY - FAILURE TO WARN; and<br>5.  STRICT PRODUCT LIABILITY - MANUFACTURING DEFECT<br><br>**DEMAND FOR JURY TRIAL** |

## **CLASS ACTION COMPLAINT**

Plaintiff, Chrystal Zurba ("Plaintiff"), individually and on behalf of all others similarly situated, files this Class Action Complaint ("CAC") against Defendant Unilever United States Incorporated ("Defendant"), and in support states the following:

## **NATURE OF THE ACTION**

1.      This is a class action lawsuit by Plaintiff, and others similarly situated, who purchased and used Batiste™ dry shampoo products. Defendant distributes, markets and sells these products over-the-counter ("OTC") under the brand name Batiste™. Batiste™ dry shampoo products have been found by an independent laboratory to be contaminated and/or adulterated with benzene, a known human carcinogen. The presence of benzene in Batiste™ dry shampoo products was not disclosed in the products' label other otherwise made known to consumers, in violation of California law. Plaintiffs and the putative class suffered economic damages due to Defendant's misconduct (as set forth below) and they seek, among other things, injunctive relief and restitution for the full purchase price of the product(s) they purchased. Plaintiff alleges the following based upon personal knowledge as well as investigation by counsel, and as to all other matters, upon information and belief. Plaintiff further believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## **JURISDICTION AND VENUE**

2.      This Court has original jurisdiction over all causes of action asserted herein under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), because the matter in controversy exceeds the sum or value of $5,000,000 exclusive of interest and costs and is a class action in which there are more than 100 class members and many members of the class are citizens of a state different than Defendant.

///

3.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391, because Plaintiff Chrystal Zurba suffered injury as a result of Defendant's acts in this district, many of the acts and transactions giving rise to this action occurred in this district, Defendant conducts substantial business in this district, Defendant has intentionally availed itself of the laws and markets of this district, and Defendant is subject to personal jurisdiction in this district.

## THE PARTIES

4.    Plaintiff Chrystal Zurba resides in Mission Viejo in Orange County, California, and at all times relevant hereto has been a resident of Orange County. Within the class period, Plaintiff has purchased and used several Batiste dry shampoo products. Most recently, on or about August 2022, Plaintiff purchased and used Batiste Dry Shampoo Plus Brilliant Blonde products, which she purchased at Walmart and Target stores in Orange County, California. She paid approximately $7.99 each for the products. When purchasing the products, Plaintiff read and reviewed the accompanying labels, disclosures, and safety information. Plaintiff was also exposed to the advertising claims related to Batiste™ dry shampoo products. Plaintiff understood these labels, disclosures and advertisements to be representations and/or warranties by the Defendant that the Batiste dry shampoo products were properly manufactured, free from defects, safe for their intended use, and not adulterated or misbranded. Plaintiff relied on these labels, disclosures and advertisements in deciding to purchase Batiste dry shampoo products, and these representations were part of the basis of the bargain. Plaintiff would not have purchased, or would have paid less, for Batiste dry shampoo products had she known they contain, or may contain, benzene. As a result, Plaintiff suffered injury in fact when she spent money to purchase dry shampoo products she would not otherwise have purchased, or paid less for, absent Defendant's misconduct, as alleged herein.

5.    Defendant is a Delaware corporation with its principal place of business located at 500 Charles Ewing Blvd., Ewing Township, New Jersey 08628.

Defendant may be served with process through its registered agent, National Registered Agents, Inc., 28 Liberty Street, New York, NY 10005.

## INTRODUCTION

6.    Around 2020, Valisure LLC and ValisureRX LLC ("Valisure"), an analytical pharmacy, ran tests on dozens of manufacturers' sunscreen products, primarily aerosol products. Through its testing, Valisure discovered that several aerosol sunscreen products contained benzene, a known human carcinogen, with values ranging from less than 0.1 parts per million ("ppm"); to 0.10 ppm to 2 ppm, to more than 2 ppm.[1]

7.    Based on its findings, on May 25, 2021, Valisure filed a Citizen Petition with the Food and Drug Administration ("FDA") asking the agency to recall all batches of sunscreen products that contained 0.1 ppm or more of benzene on the basis that they are adulterated under federal law and pose known risks to human health..[2] At that time, Valisure advised the FDA, as well as the aerosol manufacturing community, that "the presence of benzene appears to be from contamination in the identified sunscreen products." *Id.*

8.    After Valisure's Citizen Petition was filed in May 2021, litigation related to benzene contamination in sunscreen began immediately, including against Defendant's competitor Johnson & Johnson ("J&J"). J&J began an internal investigation, and quickly discovered that the source of its products' benzene contamination was the propellant that sprays the product out of the can. Less than two months later, on July 14, 2021, J&J announced it was voluntarily recalling all lots of Neutrogena and Aveeno aerosol sunscreen product lines due to the presence

---

[1] https://assets-global.website-files.com/6215052733f8bb8fea016220/62728f83d7f91acc8572e9ee_FDA-2021-P-0497-0001_attachment_1.pdf

[2] *Id.*

of benzene discovered in samples of the recalled products.[3]

9.    Also in July 2021, Valisure's CEO stated in an interview that the root cause of the benzene contamination would likely be traced to contaminated raw materials, and that he did not believe that the problem was limited to aerosol sunscreens, or sunscreens in general,[4] thus again putting all aerosol manufacturers on notice that the benzene contamination issue was likely a much broader.

10.    On November 3, 2021, Valisure filed another Citizen Petition with the FDA—this time to address benzene contamination in various manufacturers' antiperspirant and deodorant products. Through its testing, Valisure discovered that several manufacturers' aerosol antiperspirant and deodorant products contained benzene.[5] Valisure found that products containing butane were at higher risk of having elevated benzene levels and warned that "'propellants' like butane, isobutane, propane, and alcohol are commonly used and could potentially be sources of benzene contamination."[6] By November 23, 2021, manufacturers began issuing recalls of aerosol deodorant and antiperspirant products.[7]

11.    By December 2021, the FDA was advising manufacturers to test for benzene contamination, indicating that the cause of benzene contamination may be related to the propellant isobutane.[8]

---

[3] https://www.fda.gov/safety/recalls-market-withdrawals-safety-alerts/johnson-johnson-consumer-inc-issues-voluntary-recall-specific-neutrogenar-and-aveenor-aerosol.

[4] https://www.reuters.com/world/us/fda-investigating-how-known-carcinogen-wound-up-jj-sunscreen-2021-07-16/.

[5] https://assets-global.website-files.com/6215052733f8bb8fea016220/626af96f521a0584e70e50eb_Valisure%20FDA%20Citizen%20Petition%20on%20Body%20Spray%20v4.0%5B260%5D.pdf.

[6] https://www.valisure.com/valisure-newsroom/valisure-detects-benzene-in-body-spray-products.

[7] https://www.fda.gov/safety/recalls-market-withdrawals-safety-alerts/pg-issues-voluntary-recall-specific-old-spice-and-secret-aerosol-spray-antiperspirants-and-old-spice.

[8] https://www.bostonglobe.com/2021/12/23/business/fda-tells-drugmakers-test-benzene-contamination/.

12.     On October 31, 2022, Valisure filed yet another Citizen Petition with the FDA—this time to address potential benzene contamination in various manufacturers' dry shampoo products, including Batiste dry shampoo products. Valisure found that most of the Batiste dry shampoo products that were tested had excessive levels of benzene:[9]

13.     Plaintiff and putative Class member each purchased and used one or more of the following Batiste dry shampoo products that were specifically identified by Valisure as containing benzene at or above 0.1 ppm:

| Brand | UPC | Lot | Description |
|---|---|---|---|
| Batiste | 5010724529836 | RF1125 | Dry Shampoo Bare - 4.23 oz |
| Batiste | 5010724529836 | RF1155 | Dry Shampoo Bare - 4.23 oz |
| Batiste | 5010724529836 | RF0113 | Dry Shampoo Clean & Light Bare - 6.73 fl oz |
| Batiste | 5010724527467 | RF1054 | Dry Shampoo Plus Brilliant Blonde - 6.73 fl oz |
| Batiste | 5010724527399 | RF9077 | Dry Shampoo Floral & Flirty Blush - 1.6 fl oz |
| Batiste | 5010724529836 | RF1181 | Dry Shampoo Bare - 4.23 oz |
| Batiste | 5010724527443 | RF1131 | Dry Shampoo Plus Divine Dark - 6.73 fl oz |
| Batiste | 5010724527375 | RF0231 | Dry Shampoo Floral & Flirty Blush - 6.73 fl oz |
| Batiste | 5010724527443 | RF9345 | Dry Shampoo Plus Divine Dark - 6.73 fl oz |
| Batiste | 5010724527443 | LR0083 | Dry Shampoo & a Hint of Colour for Dark Hair - 6.73 fl oz |

_____

[9] https://assets-global.website-files.com/6215052733f8bb8fea016220/6360f7f49903987d8f4f4309_Valisure%20FDA%20Citizen%20Petition%20on%20Benzene%20in%20Dry%20Shampoo%20Products_103122.pdf.

CLASS ACTION COMPLAINT

| Batiste | 5010724533123 | RF1167 | Dry Shampoo Dark Hair - 6.35 oz |
|---------|---------------|--------|---------------------------------|
| Batiste | 5010724527511 | RF1259 | Dry Shampoo Tropical Exotic Coconut - 4.23 oz |
| Batiste | 5010724527481 | RF1103 | Dry Shampoo Original Classic Clean - 4.23 oz |
| Batiste | 5010724527481 | RF0167 | Dry Shampoo Clean & Classic Original - 6.73 fl oz |
| Batiste | 5010724529836 | RF0352 | Dry Shampoo Clean & Light Bar - 6.73 fl oz |
| Batiste | 5010724528150 | RF1200 | Dry Shampoo Plus Divine Dark - 1.6 fl oz |
| Batiste | 5010724527450 | LR9099 | Dry Shampoo Light & Breezy Fresh - 6.73 fl oz |
| Batiste | 5010724527399 | RF7132 | Dry Shampoo Floral & Flirty Blush - 1.6 fl oz |
| Batiste | 5010724527535 | RF8361 | Dry Shampoo Coconut & Exotic Tropical - 1.6 fl oz |
| Batiste | 5010724527399 | RF8253 | Dry Shampoo Floral & Flirty Blush - 1.6 fl oz |
| Batiste | 5010724533048 | RF1204 | Dry Shampoo Original Classic Fresh - 6.35 oz |
| Batiste | 5010724527535 | RF1350 | Dry Shampoo Tropical Exotic Coconut - 1.06 oz |
| Batiste | 5010724532966 | FG1183 | Volumizing Dry Shampoo - 6.73 fl oz (hereafter collectively referred to as "Products").[10] |

14.    Defendant knew or should have known of the Products' benzene contamination  well before Valisure's October 2022 petition. Defendant was required to subject the Products to rigorous quality assurance guidelines and applicable laws and regulations. *See* 21 CFR 211.84 (representative samples of each shipment of each lot shall be collected for testing of active and inactive components (or raw materials) to ensure compliance with all established specifications). If Defendant had actual knowledge that there was a risk the Products could be

---

[10] Discovery may reveal additional Products manufactured, sold, and distributed by Defendant that are affected by this action and Plaintiff reserves their right to include any such products in this action.

contaminated with benzene prior to Valisure's October 2022 petition, the company had an obligation to ameliorate and disclose that risk to consumers. If Defendant did not have actual knowledge that the Products could be contaminated with benzene prior to the October 2022 petition, Defendant was reckless and/or negligent as a sophisticated producer of personal care products.

15.    Upon information and belief, to the extent Defendant disclaimed knowledge of the Products' benzene contamination prior to Valisure's October 2022 petition, the company gained actual knowledge of that risk as early as July 2021. Around that time, Defendant's top competitors began recalling aerosol products due to the presence of benzene and immediately faced litigation based on those recalls. Valisure's CEO was likewise warning at that time that the benzene contamination would likely be traced to contaminated raw materials. Moreover, in November 2021, Valisure confirmed the presence of benzene in dozens of aerosol antiperspirants and deodorants, resulting in massive recalls and ensuing litigation.

16.    Despite Defendant's knowledge of the pervasive risk of benzene contamination in the Products, Defendant have failed to warn consumers of this known danger. Instead, Defendant chose to maximize its profits and delay the costs of immediately recalling the defective products it sold at the expense of its trusting customers who were unwittingly increasing their exposure to benzene contamination in the Products and continued to buy the Products. Consumers, like Plaintiff, depended on Defendant to disclose those risks but were, instead, presented with false, misleading, or incomplete representations regarding the safety and benefits of the Products and suffered damages as a result.

## BACKGROUND ON BENZENE

17.    Benzene is used primarily in the chemical and pharmaceutical industries, as a starting material and intermediate in the synthesis of numerous chemicals, and in gasoline. The major United States source of benzene is petroleum. The health hazards of benzene have been recognized for over one hundred years.

Benzene was "[f]irst evaluated by IARC in 1974 . . . and was found to be carcinogenic to humans (Group 1), a finding that has stood since that time."[11] As noted by the IARC:

> In the current evaluation, the Working Group again confirmed the carcinogenicity of benzene based on *sufficient evidence* of carcinogenicity in humans, *sufficient evidence* of carcinogenicity in experimental animals, and *strong* mechanistic evidence. … The Working Group affirmed the strong evidence that benzene is genotoxic, and found that it also exhibits many other key characteristics of carcinogens, including in exposed humans. In particular, benzene is metabolically activated to electrophilic metabolites; induces oxidative stress and associated oxidative damage to DNA; is genotoxic; alters DNA repair or causes genomic instability; is immunosuppressive; alters cell proliferation, cell death, or nutrient supply; and modulates receptor-mediated effects.[12]

18.    The Food and Drug Administration ("FDA") similarly recognizes that "[b]enzene is a carcinogen that can cause cancer in humans"[13] and classifies benzene as a "Class 1" solvent that should be "avoided."[14] And the National Institute for Occupational Safety and Health ("NIOSH") recommends protective equipment be worn by workers expecting to be exposed to benzene at concentrations of 0.1 ppm and defines "skin absorption" as an exposure route.[15] According to the National Toxicology Program ("NTP"), benzene is "*known to be a human carcinogen* based on sufficient evidence of carcinogenicity from studies in humans."[16]

---

[11] Benzene / IARC Working Group on the Evaluation of Carcinogenic Risks to Humans (2017: Lyon, France), at p. 33.

[12] *Id*. at 34.

[13] https://www.fda.gov/food/chemicals/questions-and-answers-occurrence-benzene-soft-drinksand-other-beverages#q1.

[14] https://www.fda.gov/media/71737/download.

[15] Centers for Disease Control and Prevention. *The National Institute for Occupational Safety and Health (NIOSH), Benzene* (https://www.cdc.gov/niosh/npg/npgd0049.html).

[16] http://ntp.niehs.nih.gov/go/roc/content/profiles/benzene.pdf (emphasis added).

19.   "Even in trace amounts, benzene is known to pose a health risk from exposure routes that include inhalation, ingestion, dermal absorption, and skin or eye contact."[17]

20.   FDA's Guidance for Industry Q3C provides that "Solvents in Class 1 [i.e. benzene] . . . should not be employed in the manufacture of drug substances, excipients, and drug products because of their unacceptable toxicities or deleterious environmental effect."13 That provision provides in full:

> III. SOLVENTS GROUPED BY CLASS Solvents in Class 1 [i.e. benzene] should not be employed in the manufacture of drug substances, excipients, and drug products because of their unacceptable toxicity or their deleterious environmental effect. However, if their use is unavoidable in order to produce a drug product with a significant therapeutic advance, then their levels should be restricted … [to 2 ppm], unless otherwise justified.[18]

21.   Thus, although benzene should not be employed in the manufacture of drug substances, it may be used in manufacturing *some* drug substances when (1) its use is "unavoidable" to produce a drug product with (2) "significant therapeutic advance." Defendant's Products do not meet this safe harbor exception. This is because the use of benzene in the manufacture of the Products is not "unavoidable," nor does the use of benzene in the Products provide a "significant therapeutic advance."

22.   That the use of benzene is entirely avoidable is illustrated by Valisure's testing, which showed variation of benzene contamination in the batches of Batiste and other manufacturers' dry shampoos that were tested. Some of the dry shampoo products tested contained detectible and/or or elevated levels of benzene and some did not. Given that benzene was detected in some dry shampoo products but not in

---

[17] Hudspeth, A., et al., Independent Sun Care Product Screening for Benzene Contamination, Environmental Health Perspectives, 130:3, Online Publication 29 March 2022.

[18] Food and Drug Administration, Q3C – Tables and List Guidance for Industry (2017) (https://www.fda.gov/media/71737/download).

others is evidence in itself that benzene is not required in its manufacture. Moreover, the Products do not represent a "significant therapeutic advance." The FDA has never considered dry shampoo products as representing a "significant therapeutic advance." And, considering the long history and widespread use of dry shampoo and foam shampoo products, it does not appear that such products constitute a significant therapeutic advance.

23.    Following Valisure's May 2021 petition, the FDA began working with drug and cosmetic manufacturers on the specific issue of benzene contamination. This work has resulted in the agency issuing FDA Alerts, most recently on June 9, 2022, *reminding* manufacturers that they "should not use benzene in the manufacture of drugs."[19] The FDA's latest Alert further notes that this prohibition is consistent with the agency's 2017 guidance document: "Consistent with the recommendations of the ICH Q3 guidance, manufacturers should not use benzene in the manufacture of drugs."[20] Accordingly, the FDA has worked with numerous manufacturers over the past 1 ½ years to recall drug and cosmetic aerosol products contaminated with benzene.[21]

24.    Benzene is not listed as an active or inactive ingredient (or otherwise identified as being present) on any of the labels of Defendant's Products.

25.    Defendant was required to disclose the presence of benzene in its Products. Moreover, the Defendant is not authorized to withhold information about

---

[19] https://www.fda.gov/drugs/pharmaceutical-quality-resources/fda-alerts-drug-manufacturers-risk-benzene-contamination-certain-drugs (June 9, 2022).

[20] https://www.fda.gov/drugs/pharmaceutical-quality-resources/fda-alerts-drug-manufacturers-risk-benzene-contamination-certain-drugs (June 9, 2022); Food and Drug Administration, *Q3C – Tables and List Guidance for Industry* (2017) (https://www.fda.gov/media/71737/download).

[21] Since Valisure's May 2021 petition, there have been 11 nationwide recalls of aerosol products due to benzene contamination.

the presence of benzene on the basis that benzene is a "residual solvent."[22] This is because the use of benzene in the manufacture of dry shampoo is not "unavoidable," and its use in the Products does not constitute a "significant therapeutic advance." Nor has the use of benzene in the manufacture of dry shampoo products been strongly justified in a risk-benefit analysis.

26.    Similar to FDA's Guidance for Industry Q3C, the FDA's Residual Solvent Guidance on the use of "residual solvents" for drug products (USP General Chapter) provides that because Class 1 cancer causing agents (like benzene) do not "provide therapeutic benefit," they should be "avoided" absent a showing that their use is "strongly justified" in a risk-benefit analysis. General Chapter 467 provides:

> Because residual solvents do not provide therapeutic benefit, they should be removed, to the extent possible, to meet ingredient and product specifications, good manufacturing practices, or other quality-based requirements. Drug products should contain no higher levels of residual solvents than can be supported by safety data. Solvents that are known to cause unacceptable toxicities (Class 1, Table 1) [e.g., benzene] should be avoided in the production of drug substances, excipients, or drug products unless their use can be strongly justified in a risk-benefit assessment.[23]

27.    Upon information and belief, Defendant has never conducted a "risk benefit assessment" regarding the use of benzene as a residual solvent in its Products, much less "strongly justified" its use before the FDA. Nor is the use of benzene as a residual solvent in manufacturing aerosol antiperspirant products "supported by the safety data" in light of the known health risks associated with exposure to benzene as detailed herein.

---

[22] *See* Residual Solvent Guidance, "Residual Solvents in Drug Products Marketed in the United States" (2009) (applying standards in USP General Chapter Residual Solvents).

[23] https://www.uspnf.com/sites/default/files/usp_pdf/EN/USPNF/generalChapter467Current.pdf (USP General Chapter Residual Solvents).

CLASS ACTION COMPLAINT

28.    The FDCA defines "cosmetics" by their intended use, as "articles intended to be rubbed, poured, sprinkled, or sprayed on, introduced into, or otherwise applied to the human body...for cleansing, beautifying, promoting attractiveness, or altering the appearance[.]" Federal Food, Drug, and Cosmetic Act § 201(i). "Cosmetic companies have a legal responsibility for the safety of their products and ingredients."[24]

29.    Similarly, in California, "'Cosmetic' means any article, or its components, intended to be rubbed, poured, sprinkled, or sprayed on, introduced into, or otherwise applied to, the human body, or any part of the human body, for cleansing, beautifying, promoting attractiveness, or altering the appearance." Cal. Health & Safety Code § 109900.

30.    Federal law and California law contain parallel statutes with respect to the misbranding and adulteration of cosmetics.

31.    The manufacture of any misbranded or adulterated cosmetic is prohibited under federal law[25] and California state law.[26]

32.    The introduction into commerce of any misbranded or adulterated cosmetic is similarly prohibited.[27]

33.    The receipt in commerce of any adulterated or misbranded cosmetic is also unlawful.[28]

34.    Among the ways a cosmetic may be adulterated are: "If it consists in

---

[24] https://www.fda.gov/cosmetics/resources-consumers-cosmetics/cosmetics-safety-qa-personal-care-products.

[25] *See* 21 U.S.C. §331(g).

[26] *See* Cal. Health & Safety Code § 111765 ("It is unlawful for any person to manufacture, or sell any cosmetic that is misbranded."); Cal. Health & Safety Code § 111700 ("It is unlawful for any person to manufacture, sell, deliver, hold, or offer for sale any cosmetic that is adulterated.").

[27] 21 U.S.C. §331(a); Cal. Health & Safety Code § 111710 ("It is unlawful for any person to receive in commerce any cosmetic that is adulterated or to deliver or proffer for delivery any such cosmetic.").

[28] 21 U.S.C. §331(c); Cal. Health & Safety Code § 111710.

whole or in part of any filthy, putrid, or decomposed substance; or . . . whereby it
may have been rendered injurious to health; . . . .[29]

35.    A cosmetic is misbranded "[i]f its labeling is false or misleading in any
particular."[30]

36.    Defendant wrongfully advertised and sold the Products without any
labeling to indicate to consumers that these Products contain benzene. The following
exemplar is representative of the label contained on the Products purchased by
Plaintiff and putative class members:

///

///

///

///

///

///

///

///

///

///

///

///

///

///

///

---

[29] 21 U.S.C. §361. *See* Cal. Health & Safety Code § 111680 ("Any cosmetic is
adulterated if it contains in whole or in part of any filthy, putrid, or decomposed
substance."); Cal. Health & Safety Code § 111670 ("A cosmetic is adulterated
if it bears any poisonous or deleterious substance that may render it injurious to
users under the conditions of use prescribed in the labeling or advertising of the
cosmetics, or under conditions of use as are customary or usual.")

[30] 21 U.S.C. §352(a)(1); Cal. Health & Safety Code § 111730 (same).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21



22    37.    Plaintiff and members of the putative class read and relied on the
Products' labels in deciding to purchase and use the Products. Defendant's omission
of the presence of benzene on the labels was a material factor in influencing
Plaintiffs' decision to purchase and use the Products. Plaintiffs would not have
purchased and used the Products, or would have paid less for them, had she known
the Products contain, or may contain, benzene. Thus, Plaintiff and members of the
putative class have "lost money" as a result of Defendant's misrepresentations and

have standing to do so.

38.    Plaintiff also has standing to represent members of the putative class because there is sufficient similarity between the specific Products purchased by the Plaintiff and the Products not purchased by Plaintiff. Specifically, *all* of the Products are marketed in substantially the same way – as "dry shampoo"— and *all* of the Products fail to include labeling indicating to consumers that the Products contain benzene. Accordingly, the misleading effect of *all* of the Products' labels are substantially the same.

39.    Because Defendant did not disclose benzene, a known human carcinogen, is present in the Products purchased by Plaintiff and the putative class members, the Products are adulterated and misbranded. As noted by the World Health Organization, there is no "no safe level of benzene" exposure, so it is unsuitable for human application as an ingredient in dry shampoo.[31]

40.    In addition to Product labeling, Defendant makes a significant number of representations and/or warranties regarding the safety of the Products in its advertising. For example, Defendant assures consumers that (1) it "provide[s] safe and effective products for consumers"[32]; (2) it "provid[es] effective products that are safe for our consumers"[33]; (3) it "develop[s] effective products that are safe for our consumers"[34]; (4) "our safety assurance is global and science-based"[35]; (5) "all our products are thoroughly evaluated to be used safely and effectively"[36]; (6) "[b]ased on our safety assessment, we provide proper use instructions and ingredient and safety related statements on package label and product website"[37]; (7) its "Product

---

[31] https://www.who.int/ipcs/features/benzene.pdf.

[32] https://churchdwight.com/responsibility/.

[33] https://churchdwight.com/pdf/Sustainability/2021-Sustainability-Report.pdf.

[34] https://churchdwight.com/pdf/Sustainability/2021-Sustainability-Report.pdf.

[35] https://churchdwight.com/pdf/Sustainability/2021-Sustainability-Report.pdf.

[36] https://churchdwight.com/responsibility/guiding-principles.aspx.

[37] https://churchdwight.com/pdf/Sustainability/2021-Sustainability-Report.pdf.

Development and Quality Compliance teams ensure that the finished product (and ingredients) meet all specifications"[38]; (8) its "Finished Product Evaluation ensures safety use of our products under normal use and reasonably foreseeable misuse conditions"[39]; (9) its "Post-market Surveillance and Evaluation . . . ensure[s] the safety, performance and quality expectations are met"[40]; (10) it has a "commitment to safe products via monitoring and improvements"[41]; (11) "[t]oday, none of the chemicals on our master [Chemicals of Concern] list will be used in any of our formulations"[42]; (12) "[w]e devote significant attention and care to transparently disclosing ingredient and safety information for our products"[43]; (13) "[w]e have mastered consumer safety worldwide"[44]; (14) "[w]e always do business in a responsible and ethical manner in accordance with our Global Operating Guiding Principles," which "set out the minimum standards we require of ourselves and our vendors to ensure"[45];  (15) "it is in compliance with ethical and applicable legal requirements"[46]; (16) it "compl[ies] with all other applicable legal, governmental, regulatory and professional requirements"[47]; (17) "[w]e require our vendors to be law abiding and, at a very minimum, to comply with all applicable legal, governmental, regulatory and professional requirements, … including those relating to the subject matter of these Guiding Principles"[48];  (18) "[a]ll of . . . our suppliers are expected to

---

[38] https://churchdwight.com/pdf/Sustainability/2021-Sustainability-Report.pdf.
[39] https://churchdwight.com/pdf/Sustainability/2021-Sustainability-Report.pdf.
[40] https://churchdwight.com/pdf/Sustainability/2021-Sustainability-Report.pdf.
[41] https://churchdwight.com/pdf/Sustainability/2021-Sustainability-Report.pdf.
[42] https://churchdwight.com/pdf/Sustainability/2021-Sustainability-Report.pdf.
[43] https://churchdwight.com/pdf/Sustainability/2021-Sustainability-Report.pdf.
[44] https://churchdwight.com/pdf/Sustainability/2021-Sustainability-Report.pdf.
[45] https://churchdwight.com/responsibility/guiding-principles.aspx.
[46] https://churchdwight.com/responsibility/guiding-principles.aspx.
[47] https://churchdwight.com/responsibility/guiding-principles.aspx.
[48] https://churchdwight.com/responsibility/guiding-principles.aspx.

CLASS ACTION COMPLAINT

comply with our Global Operations Guiding Principles"[49]; and (19) "[w]e clearly display all key ingredient and safety information for all our products."[50]

41.    Defendant advertises that it has implemented a Four Step Safety Assurance Process "to reassure our consumers that we make safe and effective products,"[51] while failing to disclose that its Products contain, or may contain, benzene.

42.    Defendant claims it "recognizes that it is important for consumers to know the contents of the products they use in their homes and for their families,"[52] but then fails to inform consumers that its Products contain, or may contain, benzene.

43.    Defendant represents that "[i]f you want to know what's in one of our products simply look for the product below and click to learn more" from its product ingredient disclosure form,[53] suggesting to consumers that all of the Products' contents are disclosed therein. Yet, benzene is not disclosed as being in any of the Defendant's Products, whether as an ingredient, solvent, or otherwise.

44.    Plaintiff and members of the putative class read and relied on one or more of the aforementioned representations (¶¶ 34-37) in deciding to purchase and use the Products. Plaintiff would not have purchased the Products, or would have paid less for them, had she known that these claims were false and misleading.

45.    The aforementioned representations and omissions are false and/or misleading because nowhere on the Products' labels (or elsewhere in Defendant's marketing of the Products) does Defendant insinuate, state, or warn consumers that the Products contain, or may contain, benzene.

## CLASS ALLEGATIONS

46.    Plaintiff brings this action on behalf of herself and all other similarly

---

[49] https://churchdwight.com/responsibility/guiding-principles.aspx.
[50] https://churchdwight.com/responsibility/our-products.aspx.
[51] https://churchdwight.com/responsibility/our-products.aspx.
[52] https://churchdwight.com/our-brands/product-safety.aspx.
[53] https://churchdwight.com/ingredient-disclosure/default.aspx.

situated class members (hereafter the "Class") pursuant to Rule 23(a), (b)(2) and
(b)(3) of the Federal Rules of Civil Procedure and seeks certification of the following
class against Defendant for violations of California state laws and/or similar laws in
other states:

**Nationwide Class**
All consumers who purchased, for personal use and consumption, any
Batiste™ dry shampoo product in the United States of America and/or
its territories for from November 22, 2018 to the present.

Excluded from the Class are individuals who allege personal bodily
injury resulting from the use of Batiste™ dry shampoo product. Also
excluded from this Class is Defendant, any parent companies,
subsidiaries, and/or affiliates, officers, directors, legal representatives,
employees, co-conspirators, all governmental entities, and any judge,
justice or judicial officer presiding over this matter.

47.     In the alternative, Plaintiff brings this action on behalf of herself and all
other similarly situated California consumers pursuant to Rule 23(a), (b)(2) and
(b)(3) of the Federal Rules of Civil Procedure and seeks certification of the following
Sub-Class:

**California Sub-Class**

All consumers who purchased, for personal use and consumption, any
Batiste™ dry shampoo product in the State of California from
November 22, 2018 to the present.

Excluded from the Class are individuals who allege personal bodily
injury resulting from the use of Batiste™ dry shampoo products. Also
excluded from this Class is Defendant, any parent companies,
subsidiaries, and/or affiliates, officers, directors, legal representatives,
employees, co-conspirators, all governmental entities, and any judge,
justice or judicial officer presiding over this matter.

48.     Plaintiff and their counsel will fairly and adequately protect and
represent the interests of each member of the Class. Plaintiff has retained counsel
experienced in complex litigation and class actions. Plaintiff's counsel has

successfully litigated other class action cases similar to those here and have the resources and abilities to fully litigate and protect the interests of the Class. Plaintiff intends to prosecute this claim vigorously. Plaintiff has no adverse or antagonistic interests to those of the Class, nor is Plaintiff subject to any unique defenses.

49.     The members of the Class are so numerous that joinder of all members of the Class is impracticable. Plaintiff is informed and believes that the proposed Class contains thousands of purchasers of Defendant's Products who have been damaged by Defendant's conduct as alleged herein. The precise number of Class members is unknown to Plaintiff at this time.

50.     Plaintiff's claims are typical to those of all class members because members of the class are similarly injured through Defendant's uniform misconduct described above. Specifically, Plaintiff was subject to Defendant's deceptive claims that accompanied each and every Batiste Product in Defendant's collection. Moreover, Plaintiff is advancing the same claims and legal theories on behalf of herself and all members of the Class.

51.     Plaintiff's claims raise questions of law and fact common to all members of the Class, and they predominate over any questions affecting only individual Class members. The claims of Plaintiff and all prospective Class members involve the same alleged defect. These common legal and factual questions include the following:

(a) whether Defendant's Products contain benzene;

(b) whether Defendant's omissions are true, or are misleading, or objectively reasonably likely to deceive;

(c) whether the alleged conduct constitutes violations of the laws asserted;

(d) whether Defendant's alleged conduct violates public policy;

(e) whether Defendant engaged in false or misleading advertising;

(f) whether Plaintiff and the Class members are entitled to damages and/or restitution and the proper measure of that loss; and

(g) whether an injunction is necessary to prevent Defendant from continuing to market and sell defective and adulterated Products that contain benzene, a known human carcinogen.

52.    Plaintiff and her counsel will fairly and adequately protect and represent the interests of each member of the Class. Plaintiff has retained counsel experienced in complex litigation and class actions. Plaintiff's counsel has successfully litigated other class action cases similar to those here, including litigating and settling the J&J sunscreen benzene contamination multi-district litigation. Plaintiff also has the resources and abilities to fully litigate and protect the interests of the Class. Plaintiff intends to prosecute this claim vigorously. Plaintiff has no adverse or antagonistic interests to those of the Class, nor is Plaintiff subject to any unique defenses.

53.    A class action is superior to the other available methods for a fair and efficient adjudication of this controversy. The damages or other financial detriment suffered by the Plaintiff and individual Class members is relatively small compared to the burden and expense that would be entailed by individual litigation of their claims against Defendant. It would thus be virtually impossible for Plaintiff and Class members, on an individual basis, to obtain effective redress for the wrongs done to them. Further, it is desirable to concentrate the litigation of the Class members' claims in one forum, as it will conserve party and judicial resources and facilitate the consistency of adjudications. Plaintiff knows of no difficulty that would be encountered in the management of this case that would preclude its maintenance as a class action.

54.    The Class also may be certified because Defendant has acted or refused to act on grounds applicable to the Class, thereby making appropriate final

CLASS ACTION COMPLAINT

declaratory and/or injunctive relief with respect to the members of the Class as a whole.

55.    Plaintiff seeks preliminary and permanent injunctive and equitable relief on behalf of the entire Class, on grounds generally applicable to the entire Class, to enjoin and prevent Defendant from engaging in the acts described above, such as continuing to market and sell Products that are adulterated with benzene, and requiring Defendant to provide a full refund of the purchase price of the Products to Plaintiff and Class members.

56.    Unless a class is certified, Defendant will retain monies received as a result of their conduct that were taken from Plaintiff and the Class members. Unless a Class-wide injunction is issued, Defendant will continue to commit the violations alleged and the members of the Class and the general public will continue to be misled.

## FIRST CAUSE OF ACTION

**(Violations of the Unfair Competition Law (the "UCL"), Cal. Bus. & Prof. Code § 17200, *Et Seq.* Against Defendant on Behalf of California Sub-Class)**

57.    Plaintiff incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

58.    The UCL prohibits any "unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising…." Cal. Bus. & Prof. Code § 17200.

*Fraudulent Acts and Practices*

59.    Any business act or practice that is likely to deceive members of the public constitutes a fraudulent business act or practice under the UCL. Similarly, any advertising that is deceptive, untrue or misleading constitutes a fraudulent business act or practice under the UCL.

60.    Defendant has engaged, and continues to engage, in conduct that is

likely to deceive members of the public. This conduct includes representing in its labels that the Products do not contain benzene when the Products do contain benzene.

61.    Similarly, Defendant has engaged, and continues to engage, in deceptive, untrue, and misleading advertising by representing that their Products are safe and effective (*see* ¶¶ 34-37) even though the Products contain benzene, and thus, poses a risk to human health.

62.    By committing the acts alleged above, Defendant has engaged in fraudulent business acts and practices, which constitute unfair competition within the meaning of Business & Professions Code §17200.

*Unlawful Acts and Practices*

63.    The violation of any law constitutes an unlawful business practice under Business & Professions Code §17200.[54]

64.    Defendant's conduct also violates Cal. Health & Safety Code § 111730, which prohibits the sale of any misbranded product. The Products contain labeling which omits the fact that the Products contain benzene, suggesting to consumers that the Products are safe and effective and are not potentially harmful to human health when used as directed. Such labeling is "false and misleading in any particular" in violation of Health & Safety Code § 111730.

65.    By violating the Cal. Health and Safety Code § 111730, Defendant has engaged in unlawful business acts and practices which constitute unfair competition within the meaning of Cal. Bus. & Prof. Code § 17200.

*Unfair Acts and Practices*

66.    Any business practice that offends an established public policy or is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers constitutes an "unfair" practice under the UCL.

---

[54] Defendants' conduct also violates Section 5 of the Federal Trade Commission ("FTC") Act, 15 U.S.C. § 45, which prohibits unfair methods of competition and unfair or deceptive acts or practices in or affecting commerce.

67.     Defendant has engaged, and continues to engage, in unfair business practices. This conduct includes representing that the Products do not contain benzene when in fact they do.

68.     Defendant has engaged, and continues to engage, in conduct that violates the legislatively declared policies against committing unfair methods of competition and unfair or deceptive acts or practices in or affecting commerce. Defendant gained an unfair advantage over its competitors, whose advertising for Products must comply with the UCL.

69.     Defendant's conduct, including misrepresenting the safety and efficacy of the Products, is substantially injurious to consumers. Consumers are purchasing and using Batiste Products without knowledge that the Products are, or may be, adulterated with a human carcinogen. Moreover, such conduct has, and continues to cause, substantial injury to consumers. Consumers, including Plaintiff, would not have paid money, or would have paid less money, for Products adulterated and/or potentially adulterated with a human carcinogen but for Defendants' false labeling, advertising, and promotion. Thus, Plaintiff and the putative Class have "lost money or property" as required for UCL standing, and such an injury is not outweighed by any countervailing benefits to consumers or competition.

70.     Indeed, no benefit to consumers or competition results from Defendant's conduct. Since consumers reasonably rely on Defendant's representations of the safety information contained in the Products' labels and through advertising, and injury resulted from ordinary use of the Products, consumers could not have reasonably avoided such injury.

71.     By committing the acts described above, Defendant has engaged in unfair business acts and practices which constitute unfair competition within the meaning of the UCL.

72.     An action for injunctive relief and restitution is specifically authorized under Cal. Bus. & Prof. Code 17203.

73.    Wherefore, Plaintiff prays for judgment against Defendants, as set forth hereafter. Defendants' conduct with respect to the labeling, advertising, marketing, and sale of the Products is unfair because Defendant's conduct was immoral, unethical, unscrupulous, or substantially injurious to consumers and the utility of its conduct, if any, does not outweigh the gravity of the harm to its victims.

74.    In accordance with California Business & Professions Code section 17203,[55] Plaintiff seeks an order enjoining Defendants from continuing to conduct business through fraudulent or unlawful acts and practices and to commence a corrective advertising campaign. Defendant's conduct is ongoing and continuing, such that prospective injunctive relief is necessary.

75.    On behalf of Plaintiff and the putative Class, Plaintiff also seeks an order for the restitution of all monies spent on the Products, which were acquired through acts of fraudulent, unfair, or unlawful competition.[56] In addition, because the Products either contain benzene or risk containing benzene, a known human carcinogen, the measure of restitution should be rescission and full refund insofar as the Products and their associated labels are worthless. But for Defendant's misrepresentations and omissions, Plaintiff would have paid nothing, or paid significantly less, for Products that contain benzene or may contain benzene. Indeed, there is no discernible "market" for an OTC dry shampoo product that is or may be adulterated with a known poison. As recognized by the World Health Organization, "[b]enzene is carcinogenic to humans, and no safe level of benzene can be

---

[55] "Any person who engages, has engaged, or proposes to engage in unfair competition may be enjoined in any court of competent jurisdiction." Cal. Bus. & Prof. Code § 17203.

[56] "Actions for relief pursuant to this chapter shall be prosecuted . . . by a person who has suffered injury in fact and lost money or property as a result of the unfair competition." Cal. Bus. & Prof. Code § 17204.

"The court may make such orders or judgments . . . as may be necessary to restore to any person in interest any money or property, real or personal, which may have been acquired by means of such unfair competition." Cal. Bus. & Prof. Code § 17203.

recommended."[57] As a result, the Products are rendered valueless.

76.    By reason thereof, Plaintiff and members of the putative Class are entitled to injunctive and equitable relief, and restitution in the amount they spent on the Products.

## SECOND CAUSE OF ACTION

**(Violations of California's False Advertising Law, California Business & Professions Code §§17500, Et. Seq., Against Defendant on Behalf of the California Sub-Class)**

77.    Plaintiff incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

78.    California's False Advertising Law ("FAL") prohibits any statement in connection with the sale of goods "which is untrue or misleading." Cal. Bus. & Prof. Code §17500.

79.    As set forth herein, Defendant omits from its Products' label that the Products contain, or might contain, benzene. This omission is false and likely to deceive the public because some of its Products do in fact contain benzene.

80.    Similarly, Defendant's advertising claims that their Products' are safe and effective are untrue or misleading because such claims fail to disclose that the Products are, or may be, adulterated with benzene, a cancer causing chemical which poses a health risk even at "trace levels" of exposure.

81.    Defendant knew, or reasonably should have known, that its advertising claims were untrue or misleading.

82.    Defendant's conduct is ongoing and continuing, such that prospective injunctive relief is necessary, especially given Plaintiff's desire to purchase Defendant's Products in the future if she can be assured that the Products are unadulterated and meet the advertising claims. Absent injunctive relief, Defendant may continue to advertise, promote and sell adulterated Products that deceive the

---

[57] https://www.who.int/ipcs/features/benzene.pdf.

CLASS ACTION COMPLAINT

public as to their contents and safety. Plaintiff is thus likely to again be wronged in a similar way. For instance, if Plaintiff encounters Defendant's Products in the future and there is risk those Products still contain benzene, Plaintiff may mistakenly rely on the Product's label to believe that Defendant eliminated benzene when it did not.

83.     By reason thereof, Plaintiff and members of the putative Class are entitled to injunctive and equitable relief, and restitution in the amount they spent on the Products.

### **THIRD CAUSE OF ACTION**

### **Negligent Misrepresentation/Omission**

### **(On Behalf of the Nationwide Class and California's Sub-Class)**

84.     Plaintiff incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

85.     Through its labeling and advertising, Defendant made representations to the Plaintiff and the Class members concerning the contents of its Products.

86.     Defendant has a duty to provide accurate information to consumers with respect to the contents of its Products as detailed above.

87.     Defendant failed to fulfill its duty to accurately disclose, through its labeling, advertising or otherwise, that its Products contain benzene or may contain benzene.

88.     Additionally, Defendant has a duty to not make false representations with respect to its Products.

89.     Defendant failed to fulfill this duty when it made false representations regarding the quality and safety of the Products as detailed above.

90.     Such failures to disclose on the part of Defendant amount to negligent omission and the representations regarding the quality and safety of the product amount to negligent misrepresentation.

91.     Defendant's conduct constitutes fraud in the inducement in that it occurred in connection with misrepresentations, statements or omissions which

caused the Plaintiff and putative Class members to enter into a transaction (i.e. to purchase Defendant's Products). Plaintiff would not have purchased, or would have paid less for, the Products had she known they were or could be contaminated with benzene. As such, Defendant's fraudulent activities occurred independent of the contract to purchase.

92.     Plaintiff and the other members of the Class reasonably relied upon such representations and omissions to their detriment.

93.     By reason thereof, Plaintiff and the other Class members have suffered damages in an amount to be proven at trial.

## FOURTH CAUSE OF ACTION

## Strict Product Liability – Failure to Warn

## (On Behalf of the Nationwide Class and California's Sub-Class)

94.     Plaintiff incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

95.     Defendant knew, or should have known, that its Products contain or may contain benzene, a known human carcinogen.

96.     Defendant had a duty to warn Plaintiff and the putative Class about the presence of benzene in its Products.

97.     Defendant had a duty to warn Plaintiffs and the putative Class about the dangers of the presence of benzene in its Products.

98.     Defendant knew that the risk of exposure to benzene from use of its Products was not readily recognizable to an ordinary consumer, including Plaintiff, and that consumers would not inspect the product for benzene content.

99.     Defendant did not warn Plaintiff and the putative Class that the Products contained, or may contain, benzene or about the dangers of the presence of benzene in its Products.

100.    Defendant failed to fulfill this duty when it made affirmative representations regarding the quality and safety of the Products as detailed above.

1    Such affirmative representations regarding the safety of the Products constitute

2    negligent misrepresentations which are independent of Plaintiff's economic losses.

3         101.   Plaintiff and other putative Class members have lost time and suffered

4    aggravation attempting to find alternative dry shampoo products to purchase.

5    Plaintiff and the putative Class have also suffered distress by not knowing the level

6    of benzene they were exposed to, or potentially exposed to, and the health effects of

7    such exposure.

8         102.   Plaintiff and the putative Class members have suffered damages by

9    purchasing Products in a manner promoted by Defendant, and in a manner that was

10   reasonably foreseeable by Defendant. Plaintiff and the members of the putative Class

11   would not have purchased Defendant's Products, or they would have paid less for

12   them, had they known they contained or may contain benzene.

13        103.   Plaintiff and the putative Class were justified in their reliance on

14   Defendant's labeling and advertising of the Products for use as dry shampoo.

15        104.   By reason thereof, Plaintiffs and the Class have suffered damages in an

16   amount to be proven at trial.

17   **FIFTH CAUSE OF ACTION**

18   **Strict Product Liability – Manufacturing Defect**

19   **(On Behalf of the Nationwide Class and California's Sub-Class)**

20        105.   Plaintiff incorporates by reference and re-alleges each and every

21   allegation contained above, as though fully set forth herein.

22        106.   The Products contained a manufacturing defect when they left the

23   possession of Defendant. Specifically, the Products differ from Defendant's intended

24   result or from other lots of the same product line because they contain benzene.

25        107.   Plaintiff and members of the putative Class used the Products in a way

26   that was reasonably foreseeable to Defendant.

27        108.   As a result of the defects in the manufacture of the Products, Plaintiffs

28   and the Class suffered damages in an amount to be proven at trial.

# PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, prays for judgment against the Defendant as to each and every count, including:

A.    An order declaring this action to be a proper class action, appointing Plaintiff and their counsel to represent the California Sub-Class, and requiring Defendant to bear the costs of class notice;

B.    An order enjoining Defendant from selling the Products;

C.    An order enjoining Defendant from suggesting or implying that they are safe and effective for human application;

D.    An order requiring Defendant to engage in a corrective advertising campaign and engage in any further necessary affirmative injunctive relief, including recalling all Products contaminated or potentially contaminated with benzene;

E.    An order awarding declaratory relief, and any further retrospective or prospective injunctive relief permitted by law or equity, including enjoining Defendant from continuing the unlawful practices alleged herein, and injunctive relief to remedy Defendant's past conduct;

F.    An order requiring Defendant to pay restitution/damages to restore all funds acquired by means of any act or practice declared by this Court to be an unlawful, unfair, or fraudulent business act or practice, untrue or misleading advertising in violation of the above-cited authority, plus pre- and post-judgment interest thereon;

G.    An order requiring Defendant to disgorge any ill-gotten benefits received from Plaintiff and members of the Sub-Class as a result of any wrongful or unlawful act or practice;

H.    An order requiring Defendant to pay all actual and statutory damages permitted under the counts alleged herein;

1      I.     An order awarding attorneys' fees and costs to Plaintiffs and the

2          California Sub-Class; and

3      J.     An order providing for all other such equitable relief as may be just and

4          proper.

5                  **DEMAND FOR JURY TRIAL**

6      Plaintiff demands a trial by jury on all issues so triable.

7

8   DATED: November 22, 2022.

9

**BRADLEY/GROMBACHER, LLP**
By: */s/ Kiley Grombacher*
Marcus J. Bradley, Esq. (174156)
Kiley L. Grombacher, Esq. (245960)
31365 Oak Crest Drive, Suite 240
Westlake Village, California 91361
Telephone: (805) 270-7100
Facsimile:   (805) 270-7589
E-Mail: mbradley@bradleygrombacher.com
kgrombacher@bradleygrombacher.com

**AYLSTOCK, WITKIN, KREIS &
OVERHOLTZ, PLLC**
SIN-TING MARY LIU (282884)
17 E. Main St., Suite 200
Pensacola, Florida 32502
Telephone: 850-202-1010
Facsimile: 850-916-7449
E-Mail: mliu@awkolaw.com

*Attorneys for Plaintiff and the Putative Class*

31
CLASS ACTION COMPLAINT